ODOM, Justice.
 

 This proceeding is in the nature of a eoncursus and involves the distribution of the proceeds of the sale of certain real estate situated in New Orleans, which belonged to Warren C. Graham, which proceeds are now being held subject to the rights of the creditors of said Graham.
 

 Graham owned a structure described as 4125 Fontainebleau drive in New Orleans, which he desired to convert into a modern apartment house consisting of eight apartments. Instead of having the work done by contract he undertook the construction himself and let no contracts except with furnishers of material and those who might be employed to do such work as plumbing, painting, etc. He began the work in June or July, 1928, at which time the property was incumbered with a mortgage. It appears that he did not have sufficient funds with which to complete the work, and on October 11, 1928, obtained a loan from the National Homestead Association, plaintiff herein, which obtained from him a vendor’s lien and privilege on the property under the rules regulating the transfer and retransfer of property under the building and loan laws.
 

 Having failed to pay the homestead association, it foreclosed its mortgage in July, 1930, and the property was adjudicated' to the Whitney National Bank for the sum of $16,500 cash, which sum was paid into the hands of the civil sheriff.
 

 On April 16, 1931, the plaintiff homestead association filed a rule to cancel all liens against the property and to distribute the fund realized from the sale, and served all parties who had filed liens or held judicial mortgages against the property. The rule was heard, and on April 24, 1931, was made absolute, ordering the cancellation and «rasure from the records of all inscriptions of liens and other incumbrances, and further ordering that all claims be referred to the proceeds of sale.
 

 The lien claimants came into court and asserted claims against the fund; these claims amounting in the aggregate to $12,585.01. The court appointed a commissioner to take the testimony of the claimants and report his findings. The commissioner made his report recommending that fourteen of the claims, amounting to $11,573.67, be paid in full by preference over that of the homestead association, and that the others be rejected.
 

 The claim of the homestead association amounts to $15,972.01. It filed answer to the interventions of the other claimants opposing their claims on various grounds, and con
 
 *1067
 
 tends that the entire sum now in the hands of the sheriff should be paid to it by preference. The contest therefore is between the homestead association on one side and the lien claimants on the other. And in this connection it may be stated that the homestead association does not dispute the verity of any of the claims filed. Its contention is that the claimants are not entitled to have their claims paid by preference. It is contended that some of the claimants are not entitled, as a matter of law, to liens on the building owing to the nature of the claims, and that others, although entitled under the law to liens, did not file their claims in time, and that still others who were entitled to liens and who did file their claims within the time prescribed, and therefore obtained liens, have lost their liens by prescription.
 

 (1) As to the facts, there is but little dispute except as to the date on which the building was finally completed, and in view of the conclusions which we have reached on the questions, of law raised, this point is of no importance, except in so far as the claim of Colon Neville is concerned.
 

 It is shown that at the time the homestead association made the loan to Warren C. Graham and obtained a lien on the property, the work of reconstructing the building was in progress, and Graham, the owner, had already contracted with these claimants to furnish the material for which they claim payment, and, further, that while all the material had not been delivered, yet the materialmen had commenced to deliver materials prior to the date on which the homestead association obtained and recorded its lien.
 

 Section 12, Act No. 298 of 1926, gives to the holders of vendor’s privileges and mortgages a superior claim against the property mortgaged “if said vendor’s privilege or mortgage exists and has been duly recorded before the work or labor is begun or any material is furnished.” Where work is done and material furnished under one continuous contract, the lien is timely when filed, under section 12 of this act, within 60 days from the date the last work is done or the last material furnished under the contract, and when so filed the lien primes the vendor’s mortgage even though filed after the mortgage is recorded. Gleissner v. Hughes, 153 La. 133, 95 So. 529.
 

 Therefore, if the furnishers of materials in this case are entitled to liens under the law, and if they have filed and preserved them as the act requires, they must be paid by preference over the homestead association. Whether they are entitled to liens and whether they have filed and preserved them are questions of law presented for consideration, and these questions involve a construction and interpretation of certain parts of the act.
 

 (2) Section 12, Act No. 298 of 1926, provides that when the owner undertakes the construction, improvement, repair, or erection of any work, for which no contract has been entered into, or when a contract has been entered into but has not been recorded as required by the act, then, “Any person furnishing service or material or performing any labor on said building or other work may record in the office of the Clerk of Court or Recorder of Mortgages in the parish in which said work is being done or has been done a copy of his estimate or an affidavit of his claim or any other writing evidencing same, which
 
 *1069
 
 recordation, if done within sixty days after the date of the last delivery of all material upon said property or the last performance of all services or labor upon the same, by said furnisher of material or said laborer, shall create a lien and privilege upon the building or other structure and upon the land upon which it is situated, in favor of any such person who shall have performed service or labor or delivered material in connection with the said work of improvement, as his interest may appear. Said lien and privilege, re-' corded as aforesaid, shall constitute a lien and privilege, against the said property for a period of one year from the date of its filing, unless interrupted by judicial proceeding, during which judicial proceeding said prescription shall not run.”
 

 The questions which arise are these:
 

 1. Whether the above-quoted section allows a lien in favor of those who contract with the owner to do certain portions of the work necessary in the construction of the building as a whole.
 

 2. Whether it is contemplated under said section of the act that each claimant must file his lien within 60 days from the date of the last work done or last material furnished by him, or whether his claim may be filed within 60 days from the completion of the building.
 

 3. When liens have been properly filed, whether prescription is interrupted by the filing of suit, or whether it is interrupted only by citation served on the owner.
 

 We shall dispose of the questions raised in the order named.
 

 1. Certain of the lien claimants contracted with the owner to do certain parts of the work necessary and to furnish material for the completion of the structure as a whole, and it is contended by the homestead association that these are not entitled to a lien because section 12 of the act, which applies because there was no general contract let by the owner, grants a lien only to those “furnishing service or material or performing any labor * * * or other work” on the building; in other words, it is contended that only laborers employed by the owner and those who furnish him with material and not contractors are entitled to a lien.
 

 Section 1 of the act provides that every contractor and subcontractor who performs work or furnishes material for the erection or construction of a building shall have a lien thereon for such work or material, and section 2, that such contracts shall be reduced to writing and recorded, and that the “recordation shall preserve the liens and privileges which are created by this act * * * in favor of every undertaker, architect, consulting engineer, contractor, master mechanic, or contracting engineer.” While these sections of the act make mention of “contractors” and allow liens in their favor, section 12 makes no mention of “contractors,” and for that reason it is argued that where the work is undertaken by the owner, those who do work or furnish material for him by contract have no lien.
 

 Whether those who do work or furnish material by contract have a lien under section 12 of the act or not is immaterial, because section 1 of the act in specific terms grants them a lien. It provides that: “Every contractor, sub-contractor * * * who performs work
 
 *1071
 
 or furnishes material for the erection, construction, repair or improvement of immovable property,
 
 with the consent of or at the request of the owiver thereof,
 
 or his authorized agent, or representative,
 
 or of any person with whom the owner has contracted for such worJc, shall have a lien for the payment
 
 in principal and interest of such work or labor performed * * *
 
 upon the land and improvements on which the
 
 work or labor has been done, or materials * * * furnished.”
 

 Therefore it makes no difference whether the contract is entered into with the owner personally or with a general contractor employed by the owner to do the work; all contractors and subcontractors who do work or furnish materials for the erection, construction, or repair of a building are entitled to a lien on the grounds and building for the payment of their claims.
 

 The only procedure by which the owner may escape payment of liens when filed and recorded timely and preserved according to law, is to follow the provisions of section 2 of the act by entering into a contract with another with sufficient surety for the construction of the building, reducing the contract to writing and recording it with the bond. When he complies with section 2 of the act, he is relieved of all liability on account of liens, and under section 3, the surety on the contractor’s bond “shall be liable in solido with the contractor for all labor and materials used in said work of improvements,” etc. In case he has recorded his contract and the bond, he may, after the expiration of certain delays, have erased from the records the inscription of all recorded claims by following the provisions of section 4 of the act. If, however, he enters into no contract and does the work himself, then he is personally liable for the claims of all those mentioned in section 1 of the act whose claims, when duly filed and recorded, operate as a lien on his property.
 

 . 2. Section 12 of the act provides that all persons, who have claims- in order to obtain liens, shall record “in the office of the * * * Recorder of Mortgages * * * a copy of his estimate or an affidavit of his claim or any other writing evidencing same, which recordation, if done within sixty days after the date of the last delivery of all material upon said property or the last performance of all services or labor upon the same, by said furnisher of material or said laborer, shall create a lien and privilege upon the building or other structure and upon the land,” etc.
 

 The contention made by the homestead company is that in order that a laborer, materialman, or any other may obtain a lien he must file and record his claim within sixty days from the date on which he performs his last labor, or furnishes the last material. We do not so construe the language of the act. We construe it to mean that the claim must be filed and recorded within 60 days after the last labor is performed on or last material is furnished for the building by any one. In other words, if the claim is filed within 60 days after the final completion of the building, it is in time, even though the laborer or furnisher of material did not file his claim within 60 days after he performed his last labor or furnished his last material on the building.
 

 
 *1073
 
 This is the interpretation of the language of the act made by the court in the case of Hortman-Salmen Co., Inc., v. White, 168 La. 1068, 123 So. 715, 716. But in Northrop v. Guy, 172 La. 543, 134 So. 738, 740, we referred to the Hortman-Salmen Case, and apparently considered what was said there with reference to the date on which claims must be filed and recorded under section 12 of the act, as obiter dictum, it being unnecessary to decide the question, and in Northrop v. Guy we said: “It will be our duty to definitely decide that question when it becomes necessary to do so to settle litigation.”
 

 In the case at bar, some of the claims were not filed within 60 days after the last labor was performed and the last material furnished by the particular claimants, but were filed within 60 days after the building was completed, and it therefore becomes necessary to decide the question. We now do so, and hold that under section 12, Act No. 298 of 1926, the filing and recording of claims within 60 days after the final completion of a building or other structure creates a lien on the building or structure and on the grounds, regardless of the date on which the last labor was performed or last material furnished by the particular claimant.
 

 Our holding in this respect is consistent with the provisions of section 2 of the act, which are that those who have claims' shall file and record them “not later than thirty days after registry * * * of notice of acceptance by the owner of the said work, or notice by the owner of the default of the said undertaker. * * * The delay within which to file liens, privileges and claims shall not begin to run until the date of such registry of acceptance by said owner, or registry of notice of default.” Each of the building contract laws adopted prior to the one now under consideration fixed a specific date within which claims should be filed after the acceptance of the work by the owner. In none of them was it contemplated or provided that claims should be filed during the progress of the work in order to create a lien. In those acts as well as this one, it is provided that, where work is done under contract, the owner shall record his acceptance of the work, and the delays for recording liens run from the date of the acceptance.
 

 “Of necessity, some time must be fixed for the recordation of building liens to make them fully effective.” Hortman-Salmen Co. v. White, supra; Capital Building & Loan Association v. Carter, 164 La. 388, 113 So. 886; Gleissner v. Hughes, supra.
 

 When the work is done by the owner, he is the contractor. The work is completed when the last material is furnished and the last labor is performed. That date corresponds to the date of acceptance when the work is done by contract..
 

 3. Section 12 of the act provides that ree.ordation of the claims shall create a lien, and that “said lien and privilege, recorded as aforesaid, shall constitute a lien and privilege, against the said property for a period of one year from the date of its filing, unless interrupted by judicial proceeding, during which judicial proceeding said prescription shall not run.”
 

 Some of the claimants in this case filed and recorded their claims more than one year previous to date on which the homestead as
 
 *1075
 
 sociation foreclosed its mortgage, and for that reason their liens had prescribed and were lost on that date unless the running of prescription was interrupted by “judicial proceeding.” These particular claimants filed suit on their claims against the owner within one year from the date of recording them, but failed to get service and citation within the year.
 

 Because of their failure to make service and citation on the owner within the year, the homestead association contends that their liens are prescribed, and this involves the question whether the filing of suit is a “judicial proceeding” as contemplated by the act.
 

 • A “judicial proceeding” in its broadest sense means any step taken in a court of justice in the prosecution or defense of an action. The filing of a suit is a step taken, for there can be no prosecution of an action without the filing of the suit.
 

 Ordinarily prescription is interrupted by citation. That is because the Civil Code so provides. Article 3518, which is found under the heading “Of the Causes Which Interrupt Prescription,” provides that “a legal interruption takes place; when the possessor has been cited to appear before a court of justice,” etc. .
 

 This article has reference to acquisitive prescription, but article 3551 states that “Prescription releasing debts is interrupted by all such cases as interrupt the prescription by which property is acquired, and which have been explained in the first section of this chapter.”
 

 Articles 3552 and 3553 provide that “citation served upon one debtor in solido,” “citation served on one of the heirs,” “citation served on the principal debtor,” interrupts prescription, etc.
 

 The “prescription” mentioned in these articles of the Code relates to the limitation of the right of action or the time at the end of which no suit or action can be maintained. That portion of the statute under consideration has no reference to that kind of prescription. It provides the method of establishing liens, and further provides that the liens once established shall continue in existence for one year from the date of their filing, “unless interrupted by judicial proceeding, during which judicial proceeding said prescription shall not run.” This does not relate to the right of action on the debt nor to the method of establishing the lien, but only to the life or duration of the lien once it is established.
 

 This special provision with reference to the duration or life of" liens appears not only in section 12, but also in section 6 of the statute. In each section the language is the same, that the lien shall remain in full force and effect for one year from the date of filing such claim “unless interrupted by judicial proceeding.”
 

 If the Legislature had intended that the lien should exist only for one year unless interrupted by suit or action, it would have said so. Instead, it has provided that a “judicial proceeding” shall interrupt the running of prescription, and we interpret the act to mean what it says.
 

 (5) There remains only the question as to when the building was finally completed. This question affects only one or two of the claimants, especially that of Colon Neville,
 
 *1077
 
 who did not file his lien until November 5, 1930. It is contended by counsel for the homestead association that the building was completed in December, 1928.
 

 The structure was an apartment house consisting of eight separate and distinct apartments. Some of them were completed and occupied by tenants long before the others were completed. The homestead association relies chiefly upon the testimony of Lemarie, Ryan, Noble, all disinterested witnesses, to show that the structure was completed long before 1930.
 

 Lemarie is a real estate man. He inspected the building on three different occasions; once on December 7, 1928, then in July, 1929, and finally in October, 1930. He said on direct examination that the house “seemed to be complete” in 1928. But on cross-examination (p. 455 of record) he said that he did not inspect all the apartments in 1928 or 1929. He was asked whether some of the apartments were or were not complete, and he said, “Some of the apartments that I did not visit, I do not know what the condition was.” He said that in October, 1930, “we covered the building completely. On the other two I don’t think we went through every apartment.”
 

 Mr. Ryan, superintendent of construction for the bank which bought the property in May, 1931, says that he inspected it for the bank when taken over, and that no repairs or additions were then necessary.
 

 Mr. Noble moved into apartment E in March or April, 1930, and six months later into apartment B. When he moved in, those were complete, and he says the garage was also complete. He did not say that he had visited all the other apartments. He therefore could not know whether they were complete.
 

 Counsel in their brief lay stress on Le-^ marie’s statement (page 451) that: “There positively was no change between Dec. 1928 and July 1929. If there was any change made between July 1929 and October 1930, I did not notice it when I went up there.” This answer was given in response to questions-about the roof. The connection in which this testimony was given indicates that the witness had reference to the roof only. Counsel call attention to the testimony of Morris, who installed some “Murphy beds” in the apartments in the latter part of 1928, and says the “premises” were about finished then. He was asked, “When you say they were nearly finished, what do you mean?” He replied, “I only have reference to the closets.” He was also asked (page 380), “Do you know what the condition of the building was as regards completion when they delivered those Murphy beds?” - He replied, “No, Sir, I don’t.” We note that he installed only three beds. There were eight separate apartments.
 

 Mr. Pos, the plumber, said he did his work in the latter part of 1928, and that the building was then “nearly completed.” He says (page 270) that there were a great many other items to complete.
 

 Other witnesses were called by counsel for the homestead association or were examined by counsel for the lien claimants, but not one of them pretended to state that the structure was completed on any particular date. Their testimony in the main was to the effect that they had delivered material on certain dates, and some of them testified that the parts of
 
 *1079
 
 the building inspected by them seemed to be practically complete, but they could not say all the work was done.
 

 The claims filed were all, except Neville’s, for material furnished. Apparently Graham was paying the laborers as they did the work. Neville, who was superintending the work for Graham, says that the laborers would not work without being paid regularly. None of them were called to testify as to the date of the last work performed by them, .except the plumber. Neville says that work on the building progressed rapidly at first, but that later it dragged because Graham did not always have money to pay laborers, tie says that work continued on the building into 1930, and a man named De Roode testified that he saw men working there the latter part of February or March 1, 1930.
 

 According to Neville, the work was never entirely completed. He went into detail as to the items not finished, and no witness was called to contradict him. He says that he stayed on the work until October, 1930, and as to that he is not- contradicted. Our conclusion is that the structure was never finally completed due to the financial embarrassment of Graham, but that up to October, 1930, he hoped to complete it, and made efforts to do so.
 

 Hope of being able to do so seems to have been abandoned about October 1, 1930, and Neville filed his claim on November 5.
 

 Some objection was made to the claim of Neville, first, on the ground that he had not proved it; and, second, on the ground that, architects are not entitled to a lien.
 

 He testified that he was superintendent of the work for the owner under an agreement that he was to receive as compensation 10 per cent, of the amount of labor and material, all of which amounted to approximately $35,000. His testimony is corroborated,, and we think his claim well established. Mr. Neville is an architect, but he did not work on this building as such.. He was employed as supervising engineer, and worked as such.
 

 Pleas of estoppel were filed by the homestead association and by certain of the lien claimants against the association. We have not mentioned them because they are without merit.
 

 The trial court appointed Mr. Pierre D. Olivier as special commissioner to take testimony of all claimants and report his findings. We have read his report and checked his findings with the record, and find them accurate and correct in every detail. He was allowed a fee of $500 for his work, and the stenographer who took the testimony was allowed $400. These allowances were opposed as excessive. We think they are not so, and approve them.
 

 We find no error in the judgment appealed from, and affirm it.
 

 O’NIEIXi, C. J., and BRUNOT, J., recused.
 

 ST. PAUL, J., absent on account of illness, takes no part.